Thomas M. Melton, Esq., Bar No. 4999
Securities and Exchange Commission
15 W. South Temple Street
Suite 1800
Salt Lake City, UT 84101
(801) 524-6748

David B. Reece, Esq.
Texas Bar No. 24002810
Securities and Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, Texas  76102-6882
(817) 978-6476

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** § § § | |
| **Plaintiff,** § § | 2:09-cv-1050 |
| **vs.** § § | Magistrate Judge Samuel Alba |
| **WHITNEY D. LUND, SR. and STANDARD TRANSFER & TRUST CO.** § § § | |
| **Defendants.** § § | |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission alleges as follows:

## SUMMARY

1.      This case involves the fraudulent distribution and sale of unregistered securities

by Whitney Lund, a Salt Lake City resident and the president of Standard Transfer & Trust Co.,

a registered transfer agent.  Abusing his position as a transfer agent, Lund was able to

fraudulently sell what were, in reality, restricted shares of the common stock of Mosaic Nutraceuticals Corp., f/k/a Mosaic Nutriceuticals Corp. ("Mosaic"), a Dallas-based corporation.

2.      Lund's scheme involved several steps.  After taking control of a private company, including a nominee president and directors, he issued 150,000 shares of the company to himself and 150,000 shares in the name of each nominee director.  Lund  maintained control over those shares.  When the opportunity arose, he initiated a 25:1 forward stock split of his private company, increasing the private company shares under his control to 15 million.  He then created a new company – Mosaic – by  orchestrating a reverse-merger between his private company and a public shell.

3.      After the merger, the 15 million shares Lund controlled were no longer shares of the private company, but instead represented a right to newly issued restricted shares of Mosaic. Lund effectively controlled over 30% of Mosaic's total outstanding shares.  In addition, Lund set himself up as Mosaic's transfer agent.  As Lund knew, the issuance of these Mosaic shares was not registered under the Securities Act of 1933 ("Securities Act").  Because these were newly issued securities and they were under the control of a control person, Lund,  as Mosaic's transfer agent, should have ensured that the securities were properly marked with a restrictive legend, warning brokers and other market participants that the shares could not be freely re-sold. Instead, Lund fraudulently ensured that the certificates did not have such a restrictive legend, misrepresented to market participants that the shares under his control were free trading, and tried to cover up his illegal distribution by creating bogus transfer agent records.  He immediately distributed millions of those shares for resale into the public to consultants working

for Mosaic who sold substantial shares into the public market.  Lund also promptly began selling his own shares into the public market, reaping $700,000 in illegal proceeds.

4.       Months after the merger, during the same time regulators began making inquiries related to Mosaic, Lund took an even further step to try to hide his misconduct.   He tricked an attorney into providing a backdated and false opinion letter describing the shares as free trading and stating that the shares could be transferred without a restrictive legend.  Lund added this backdated letter to his transfer agent files and produced it to the Commission staff.  Finally, he testified falsely to Commission staff that he had relied on the opinion letter when he removed the restrictive legends.

5.       Through these actions, Lund committed securities fraud and improperly sold and distributed unregistered securities.  Specifically, he violated the Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act), Section 17(a) of Securities Act, and Sections 5(a) and (c) of the Securities Act.

6.       In addition, Lund and his company, Standard Transfer & Trust, routinely ignored a variety of securities regulations that govern transfer agents and are designed to ensure that transfer agents properly serve their role as gatekeepers in the securities markets.  As a result, Standard Transfer & Trust violated Sections 17(a)(3), 17A(c)(2) and 17A(d)(1) of the Exchange Act and Rules 17Ac2-1, 17Ac2-2, 17Ad-2, 17Ad-3, 17Ad-6, 17Ad-10, 17Ad-12, 17Ad-13, 17Ad-17, 17Ad-19 and 17f-1 thereunder.  Through his actions, Lund aided and abetted these violations.

7.       The Commission, in the interest of protecting the public from further violations of the federal securities laws, brings this action seeking an order permanently enjoining Defendants

from violating and aiding and abetting violations of certain of the federal securities laws, imposing civil monetary penalties and disgorgement of ill-gotten gains, plus pre-judgment interest, and issuing a penny stock bar against Lund.

## JURISDICTION AND VENUE

8.      The Commission brings this action pursuant to the authority conferred on it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)] to restrain and enjoin the defendants from engaging in the acts, practices and courses of business described in this Complaint and acts, practices, and courses of business of similar purpose.  The Commission seeks permanent injunctions, disgorgement of ill-gotten gains plus prejudgment thereon and civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act  [15 U.S.C. § 78u(d)(3)].

9.       This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Defendants have, directly and indirectly, made use of the means or instrumentalities of interstate commerce and/or the mails in connection with the transactions described in this Complaint.

10.      Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain of the acts and transactions described herein took place in the District of Utah, Defendant Lund resides in the District of Utah, and Defendants Lund and Standard Transfer and Trust conduct business in the District of Utah.

## DEFENDANTS

11.     Whitney Lund resides in Salt Lake City, Utah, and is the president of Standard Transfer & Trust Co., a Nevada Corporation that does business in both Nevada and Utah.  From 1983 to 1989, Lund was a registered representative associated with several regional brokerage firms.  In September 1987, Lund agreed, without admitting or denying liability, to disgorge $21,000 and to pay a $41,500 civil penalty as part of a consent judgment entered in a securities enforcement action in which the Commission alleged that Lund and others engaged in insider trading and issued false and misleading press releases concerning a publicly-traded issuer.

12.     Standard Transfer & Trust Co. is a corporation organized under the laws of Nevada that does business at both its office in Las Vegas, Nevada, and at Lund's residence in Salt Lake City, Utah.  It has been registered as a transfer agent with the Commission (registration number 084-05819) since 1999.  During the time relevant to this Complaint, it served as Mosaic's transfer agent.  It serves as the transfer agent for 25-30 issuers of publicly-traded stock. It is controlled by Lund and owned by a company Lund controls named Mtn. West Equities Corporation.  Standard Transfer & Trust keeps and processes transfer agent records in both locations, Salt Lake City and Las Vegas.

## FACTS

### A.    LUND OBTAINS A PRIVATE COMPANY AND ISSUES SHARES TO HIMSELF AND TO NOMINEE DIRECTORS

13      In the fall of 1995, Lund took control of a private company named Westchester Group, Inc.  Shortly thereafter, Lund recruited three individuals – a friend who performed handiwork and construction jobs for Lund, the friend's wife and the friend's cousin – to serve as

directors of Westchester (the "nominee directors").  The friend also agreed to serve as Westchester's president.

14.      On February 20, 1996, Lund prepared board minutes reflecting that the Westchester board approved the issuance of 150,000 restricted shares to each of the three nominee directors and to Lund for their "service" (for a total of 600,000 restricted shares) on Westchester's board of directors.  Lund caused his shares to be issued in the name of his company Mtn. West Equities Corporation (the parent company of Standard Transfer & Trust).

15.      While Lund only issued 150,000 shares in his company's name, in reality, he controlled all 600,000 shares that were authorized on February 20, 2006.  The nominee directors did not actually receive any stock certificates reflecting their respective  150,000 shares; Lund maintained possession of those certificates.  This is not surprising, given that the nominee directors were involved in the company in name only.  None ever performed any real activity for Westchester.

16.      Also on February 20, 1996, Lund caused the issuance of another 60,000 restricted shares of Westchester stock to an entity he owned, putatively as payment for Lund's consulting services.

**B.      LUND ORCHESTRATES A REVERSE MERGER TO LAUNCH MOSAIC.**

17.      Between 1996 and early 2004, Westchester performed no business operations and was essentially dormant.

18.      On April 20, 2004, Lund arranged for Westchester to enter into an asset purchase agreement to acquire certain nutraceutical formulas, domain names, website designs, product

labels, and distribution contacts.  Lund negotiated and signed the agreement on behalf of Westchester, obligating Westchester to pay $30,000.

19.     Shortly thereafter, in May 2004, Lund initiated a 25:1 forward stock split of Westchester's common shares that increased the number of outstanding shares from 1,282,500 to 32,062,500.  This forward stock split increased the 150,000 shares of Westchester stock held by each of the three nominee directors and Lund to 3.75 million shares each – 15 million total.   The Westchester directors did not receive any certificates representing these shares.  Instead, Lund controlled all the certificates and, therefore, all 15 million shares.  In addition, Lund controlled at least a portion of the 60,000 pre-split shares issued to another of his entities in payment for his putative consulting services.

20.     Shortly after the stock split, Lund engineered a reverse merger between Westchester and a Nevada public shell company named ePublishedBooks.com, Inc. ("ePub").  Lund signed the merger agreement (dated as of May 21, 2004 and filed with the Nevada Secretary of State on May 25, 2004) on behalf of Westchester.  The three putative "directors" of Westchester had nothing to do with it.  Lund simply called his friend in May 2004 and told him he and the other directors needed to resign from Westchester's Board because Lund had found a merger partner for Westchester.  Because the friend had not done anything related to Westchester since 1996, Lund had to remind the friend of the company.  The directors resigned as Lund asked.

21.     As a result of the reverse merger, ePub acquired all of Westchester's shares and the separate existence of Westchester ceased.  ePub, the surviving corporation, changed its name to Mosaic Nutriceuticals Corp.  On May 24, 2004, Lund recruited Charles Townsend, a former

business associate, to serve as president and a director of Mosaic.   Lund's transfer agency,

Standard Transfer, became the transfer agent for Mosaic.  Mosaic is a public company whose

stock is traded on the Pink Sheets under the ticker symbol "MCNJ."  Mosaic became a reporting

company on July 13, 2005 when it filed a Form 10S-B with the Commission.

### C.     LUND FRAUDULENTLY ISSUES 15 MILLION MOSAIC RESTRICTED SHARES, DISGUISES THEM TO APPEAR TO BE "FREE TRADING" SHARES AND BEGINS DISTRIBUTING THEM.

22.     As a result of the reverse-merger that caused Westchester to cease to exist, a

holder of Westchester stock was entitled to an equal number of shares of Mosaic stock.   In

Lund's case, following the reverse-merger, he effectively controlled 15,750,000 restricted

Mosaic shares (i.e., the 15 million issued to his company and the nominee directors and, at least

an additional 750,000 of the shares that had been issued to the Lund-controlled entity in payment

for Lund's putative consulting services).  This effective control represented more than 30% of

Mosaic's outstanding common stock.

23.     As detailed below, Lund promptly began to issue, distribute, and sell Mosaic

shares, but only after he took deliberate steps to ensure that the certificates representing those

shares were not burdened with a restrictive legend.  There was no registration statement in effect

regarding these distributions.  Knowing or reckless in not knowing that this distribution was

improper, Lund falsified transfer agent records, fraudulently obtained a false, backdated attorney

opinion letter, and misled Commission staff.

24.     Shortly after the reverse-merger, Lund, on his own, recruited a consultant he

knew ("Consultant") to market and place Mosaic's products.  As compensation for his services,

the Consultant specifically requested free-trading shares of Mosaic stock and Lund agreed to

provide him with free-trading stock.  Additionally, the Consultant told Lund that he would periodically instruct Lund to transfer blocks of shares to various people that were assisting him in his marketing efforts.

25.     As a result of his conversation and agreement with the Consultant, Lund intended at that time to send stock to the Consultant and those assisting the Consultant from the Mosaic shares Lund controlled.   He was aware that those who received the stock intended to treat them as free-trading shares that would be resold into the public.

26.     Ultimately, the Consultant directed Lund to send, in total, approximately 6.5 million Mosaic shares to brokerage accounts held by various individuals involved in marketing Mosaic's products.  As detailed below, Lund issued and distributed approximately 6.5 million shares to those individuals and additional Mosaic shares to the former nominee Westchester directors.  Lund made sure that none contained a restrictive legend, and, therefore, the recipients had no difficulty when they resold many of these shares into the public.  Likewise, some of the shares were received *via* a Depository Trust Corporation ("DTC") transfer.  In normal situations, the DTC only deals with free trading stock, not securities with restrictions.  In this case, Lund fraudulently removed the restrictive legends and falsified the transfer agent records he controlled, thereby allowing the securities to move through DTC.

27.     Beginning in June and July 2004, Lund began carrying out the distribution noted above.  On behalf of Standard Transfer and acting in his capacity as the company's transfer agent, Lund began to fraudulently "remove" the restricted legends from Mosaic stock certificates in his control.  When he began this distribution, Lund effectively controlled the right more than 30% of the available Mosaic shares.

28.     On June 7, 2004, Lund fraudulently issued five Mosaic certificates representing 3,000,000 Mosaic shares to an entity identified by the Consultant and 750,000 shares in the name of a nominee Westchester director.  Lund distributed those securities for resale into the public. There was no registration statement in effect regarding these transactions.  Moreover, the shares were restricted securities and should have contained a restrictive legend.  Lund knew or was reckless in not knowing the restricted nature of these securities.  Nevertheless, Lund deliberately caused the certificates to not bear a restrictive legend to give the false appearance that these shares were free trading.  To disguise this improper distribution, Lund caused the transfer agent records to falsely state that "Restricted Legend Removed pursuant to SEC Rule 144K" and generated sham correspondence from the nominee director and a false, backdated attorney opinion letter that purported to justify the removal of the restrictive legends.

29.     On June 29, 2004, Lund fraudulently issued eight Mosaic certificates representing 3,250,000 Mosaic shares to an entity identified by the Consultant and 500,000 shares in the name of a nominee Westchester director.  Lund distributed those securities for resale into the public. There was no registration statement in effect regarding these transactions.  Moreover, the securities were restricted securities and should have contained a restrictive legend.  Lund knew or was reckless in not knowing the restricted nature of these securities.  Nevertheless, Lund deliberately caused the certificates to not bear a restrictive legend to give the false appearance that these shares were free trading.  To disguise this improper distribution, Lund caused the transfer agent records to falsely state that "Restricted Legend Removed pursuant to SEC Rule 144K" and generated sham correspondence from the nominee director and a false, backdated attorney opinion letter that purported to justify the removal of the restrictive legends.

30.     On July 15, 2004, Lund fraudulently issued four Mosaic certificates representing 300,000 Mosaic shares to an individual identified by the Consultant and 3,500,000 shares in the name of a nominee Westchester director.  Lund distributed those securities for resale into the public.  There was no registration statement in effect regarding these transactions.  Moreover, the securities were restricted securities and should have contained a restrictive legend.  Lund knew or was reckless in not knowing the restricted nature of these securities.  Nevertheless, Lund deliberately caused the certificates to not bear a restrictive legend to give the false appearance that these shares were free trading.  To disguise this improper distribution, Lund caused the transfer agent records to falsely state that "Restricted Legend Removed pursuant to SEC Rule 144K" and generated sham correspondence from the nominee director and a false, backdated attorney opinion letter that purported to justify the removal of the restrictive legends.

31.     Lund created multiple false records covering up this improper distribution.  Lund drafted or prepared a form letter and provided it to each nominee director for his signature.  The letter regarding the June 7, 2004 distribution was dated June 6, 2004; the letter regarding the June 29 distribution was dated June 28, 2004; and the letter regarding the July 15 distribution was dated June 28, 2004.  Each letter was created to appear as if it were drafted by the nominee director and sent to Lund, in his capacity as Operations Officer for Standard Transfer & Trust.  The letters are designed to appear as if legitimate shareholders are asking a real transfer agent to remove restrictive legends pursuant to Rule 144(k).  In reality, Lund controlled the shares and, knowing or acting recklessly in not knowing that they were restricted, he wanted to issue new certificates that appeared to represent free trading shares.  He did just that.  He drafted form

letters and presented them to the nominee directors for signature and then put the sham letters in his transfer agent files to create a false and misleading picture of what transpired.

32.     Each letter began by stating that "the purpose of this letter is to induce you to allow the re-issuance of certificate(s) to me evidencing the Stock enclosed herein with the removal of the 'restrictive' legend in the manner permitted by Rule 144(k) of the Securities Act of 1933.  In order to induce you to remove the 'restrictive legend' I represent and affirm that: …" Following this introductory statement, each letter represented that the "signatory" was the owner of Mosaic shares and then set out a series of representations, many of which were materially false or misleading.  For example, each letter stated that "I acquired the stock at least two years ago…"  In reality, and as Lund knew or was reckless in not knowing, the shares were newly issued shares under his control.

33.     Each letter also stated that the signatory was "not aware of any facts or circumstances indicating that I am or might be deemed an underwriter within the meaning of the Securities Act of 1933 with respect to such securities" and that he "was not individually or together with others engaged in making a distribution."  Lund knew or was reckless in not knowing when he provided these letters to be signed by the nominee directors and when he issued new certificates lacking restrictive legends that the entire transaction, including Lund's arranging for Westchester to acquire assets, Lund's actions in finding a public shell, Lund's actions in merging Westchester into the shell and creating a new public company, Lund's providing these sham letters, and Lund's issuing new certificates without restrictive legends was an effort by Lund to distribute the shares he controlled.

34.     At the time of his distributions, Lund was an affiliate of Mosaic.  In addition, there was no registration statement in effect as to the transactions and the distribution involved interstate commerce.

35.     Lund also issued five certificates, representing 3,750,000 Mosaic shares, to his company Mtn. West Equities.  One of the certificates was actually in Mtn. West Equities' name, the other four were in the name of "Wasatch Summit Development div. of Mt. West Equities Corp."  Again, he took deliberate and fraudulent steps to ensure that these newly issued securities were not burdened by a restrictive legend.  He then immediately began selling these shares into the public.  There was no registration statement in effect regarding these transactions.  In his transfer agent records, Lund falsely stated that "Restricted Legend Removed pursuant to SEC Rule 144K."

36.     As before, Lund created multiple false records covering up this improper and fraudulent action.  Lund drafted or prepared a form letter dated November 28, 2004 and signed it.   The letter was created to appear as if it were drafted by Lund in his capacity as president of Mtn. West Equities Corp. and sent to Lund in his capacity as Operations Officer for Standard Transfer & Trust.  The letter is designed to appear as if a legitimate shareholder is asking a real transfer agent to remove restrictive legends pursuant to Rule 144(k).  In reality, Lund controlled the shares and, knowing or acting recklessly in not knowing that they were restricted, he wanted to issue new certificates that appeared to represent free trading shares.  He did just that.  He drafted a form letter and put it into his transfer agent files to create a false and misleading picture of what transpired.

37.     Lund's letter to himself purported to relate to certificate number 4033, which the letter and Lund's transfer agent records suggested represented 3,750,000 restricted shares of Mosaic.  As before, in the letter, Lund wrote that "the purpose of this letter is to induce you to allow the re-issuance of certificate(s) to me evidencing the Stock enclosed herein with the removal of the 'restrictive' legend in the manner permitted by Rule 144(k) of the Securities Act of 1933.  In order to induce you to remove the 'restrictive legend' I represent and affirm that: …" Following this introductory statement, the letter represented that the "signatory" was the owner of Mosaic shares and then set out a series of representations, many of which were materially false or misleading.

38.     The letter falsely states that "I acquired the stock at least two years ago...." In reality, and as Lund knew or was reckless in not knowing, the shares were newly issued shares under his control.

39.     The letter also falsely states that he is "not aware of any facts or circumstances indicating that I am or might be deemed an underwriter within the meaning of the Securities Act of 1933 with respect to such securities" and that he "was not individually or together with others engaged in making a distribution."  Both of these statements are false.  The entire transaction, including Lund's arranging for Westchester to acquire assets, Lund's actions in finding a public shell, Lund's orchestration of  the merger between Westchester and the public shell to create a new public company, and Lund's removal of the restrictive legends, was an effort by Lund to distribute his shares into the public market.  As evidenced by his central role in all of these acts, Lund knew or was reckless in not knowing that these statements were false or omitted material information necessary to make them not be misleading at the time he made them and knew or

was reckless in not knowing of those false statements and omissions when he removed the restrictive legends.  Lund's *scienter* is further confirmed by his later actions in fabricating a backdated attorney opinion letter to cover up these acts and his false and misleading testimony to Commission staff.

40.     On November 29, 2004, Lund "canceled" Certificate 4033R (the "R" reflecting the certificates' restricted status) and issued five new certificates representing, in total, 3,750,000 Mosaic shares in name of Mtn. West Equities Corp. and "Wasatch Summit Development, a div of Mt. West Equities Corp."  As a result of Lund's actions, these new certificates were unburdened by restrictive legends and therefore gave the false appearance that they were free trading.  As detailed below, he promptly began reselling those securities into the public.

41.     At the time of the distribution, there was no registration statement in effect as to these transactions and the distributions involved the use of interstate commerce.  .

### D.     LUND FABRICATES A COVER STORY BY OBTAINING A BACKDATED OPINION LETTER AND MISLEADING COMMISSION STAFF.

42.     As described above, Lund caused the records of Standard Transfer & Trust, Mosaic's transfer agent, to reflect that the certificates in the names of the nominee directors and his company, Mtn. West Equities Corp., did not contain restrictive legends pursuant to Rule 144(k) of the Securities Act.  He produced those false records to Commission staff who were investigating issues related to Mosaic's securities.

43.     As an additional part of his deception, Lund obtained an attorney's opinion letter that was dated June 2, 2004 and was signed by a Utah attorney.  The opinion letter stated that Rule 144(k) exempted the securities from the registration requirements of the federal securities laws and that therefore the certificates did not require a restrictive legend and could be freely

traded.  Lund not only put this opinion letter in his transfer agent files, he produced it to the Commission and testified in the Commission's investigation that he relied on it in "removing" the restricted legends from the Mosaic stock certificates he issued in June-November 2004. Lund further testified that he had contacted the Utah attorney at approximately the same time as the merger between Westchester and e-Pub, i.e., in May 2004.  These records were fabricated, and Lund's testimony was false.

44.    In reality, Lund did not contact the Utah attorney about removing the legends on the Mosaic shares or about drafting the opinion letter until December 2004 or January 2005 – at least six months *after* the date that appears on the opinion letter and ***after*** the distributions for public resale had already taken place.  Notably, on December 6, 2004, the Financial Industry Regulatory Authority (formerly the National Association of Securities Dealers) directed an inquiry letter to Mosaic and, in December 2004, Commission staff began to make inquiries to Lund regarding Mosaic, including his Mosaic-related transfer agent records.

45.    Lund also provided the Utah attorney with a form opinion letter for the Utah attorney to copy.  Indeed, the Utah attorney, in essence, simply transferred most of the form Lund provided to the Utah attorney's letter head.  The "opinion letter" incorporates several misrepresentations and omissions that Lund provided to the Utah attorney in December 2004 or January 2005.

46.    For example, Lund misrepresented that none of the shareholders were affiliates of the issuer and misrepresented that the shares had been held for two years (when in reality the shares had been issued after the May 2004 merger) and otherwise met the requirements of the Rule 144(k) exemption.  He also failed to disclose facts necessary to make his representations

regarding the time period within which the securities had been held not misleading; failed to

disclose the material fact that Lund controlled Mtn. West Equities Corp; failed to disclose that

shares had been issued in the names of the nominee directors but were in fact controlled by

Lund; failed to disclose that Lund controlled approximately 30% of Mosaic's outstanding

common stock; failed to disclose that Lund intended to (and in fact already had) distributed the

shares for public re-sale; and failed to disclose the key role he had played in setting up and

controlling the distribution of Mosaic shares.  Lund made these representations and omissions

knowing that they would be used as the basis for the opinion letter that would be placed in his

files and provided to others.

   47. Lund further lied to the Utah attorney in December 2004 or January 2005 by

falsely stating that he needed the letter backdated because he wanted the letter to be consistent

with the merger date.  Notably, but not surprisingly, Lund did not tell the Utah attorney about the

inquiries that had been made by financial regulators.

   48. Lund knew or was severely reckless in not knowing that this letter was false and

gave the false appearance that the Mosaic shares were free trading.  In reality, no exemption was

applicable.  Lund produced this false, backdated opinion letter to the Commission staff and then

testified falsely under oath that he had relied on this opinion letter to remove the restrictive

legends from the Mosaic securities he controlled.  In short, Lund used this false, backdated

opinion letter to interfere with the Commission's investigation by trying to hide the nature of his

distribution and other actions.

E.    **MOSAIC PUMPS ITS STOCK THROUGH FALSE AND MISLEADING PRESS RELEASES**

49.    Having ensured that his 15 million shares were no longer impaired, Lund stood ready to immediately profit by beginning to resell those shares.  Shortly thereafter, on July 13, 2004, August 3, 2004, and November 17, 2004, Mosaic issued three false press releases that materially impacted the price at which the company's shares traded.  For example, there was no recorded trading of the company's stock between May 28, 2004 and July 19, 2004.  Curiously, Lund was, at a minimum, involved in the preparation of at least the August 3, 2004 press release and provided a "forward looking" statement to the draft of the release.

50.    On July 20, 2004, a week following the first false press release, the price closed at $0.25 per share on trading volume of 500 shares.  On August 4, the first full business day after the second false press release, the price rose 73 percent from the previous day on trading volume of 299,566 shares.  On November 17, 2004, the day of the third false press release, the stock price increased 94% to close at $0.35 per share on trading volume of 597,638 shares; the next day, it increased to $0.45 per share on trading volume of 809,142 shares.

51.    On February 2, 2005, the Commission temporarily suspended trading in Mosaic's stock.  Ultimately, in a separate administrative proceeding in connection with these false press releases, both Mosaic and Townsend have agreed to cease and desist from violating the antifraud provisions of the Exchange Act based on findings that the press releases were false.

F.    **LUND FRAUDULENTLY SELLS HIS STOCK.**

52.    As a result of the dissemination of false and misleading information by Mosaic, an artificially inflated market for Mosaic's stock was created.  It was into this artificially inflated market that Lund sold some of his purportedly non-restricted stock to unsuspecting investors.

53.    On November 29, 2004, Lund directed his broker to sell 46,000 Mosaic shares from an account in the name of Mtn. West Equities Corp.  On November 30, 2004, his broker actually received one of the November 29, 2004-issued certificates that represented the shares necessary to support the November 29 sell order.  As described above, Lund issued this new certificate and ensured it did not have a restrictive legend.  On November 30, Lund directed the sale of another 4,000 shares.

54.    In placing the sell order and in delivering the certificate that lacked any restrictive legend, Lund misrepresented that securities were free trading and not subject to restriction. Without such representations, and if the certificates had been properly marked as restricted when received, the broker would not have allowed the securities to be sold.  In reality, as Lund knew, or was reckless in not knowing, he did not possess free trading shares and he had fabricated the transfer agent records to give a false appearance that the shares were unrestricted and free trading.  The same pattern followed with additional transactions in which Lund sold Mosaic securities into the public.

55.    Lund made similar material misrepresentations and omissions on, at least, December 15, 2004, when Lund directed the broker to sell another 12,000 shares and on December 17, 2004 when he delivered to his broker another of the Mosaic certificates from which he had fraudulently removed the restrictive legend.  These representations were also implicit each time he sold his Mosaic shares into the market up through April 7, 2006.

56.    Lund continued to sell his Mosaic stock even after the Commission suspended trading on February 2, 2005.  There was no registration statement in effect with regard to Lund's issuance of Mosaic securities and his selling of Mosaic shares.  The transactions involved the use

of interstate commerce.  There was no notice filed with the Commission (i.e., a filed Form 144) providing the Commission notice of any of Lund's issuances or sales.  At least until 90 days following the filing of the company's Form 10 on July 13, 2005, there was no public information available concerning Mosaic when Lund sold his Mosaic securities.

57.     In total, between November 2004 and April 2006, Lund sold 1,081,282 Mosaic shares, garnering profits of $713,199.66.  In distributing the Mosaic certificates under his control after ensuring they lacked restrictive legends, and in offering and selling these securities, Lund misrepresented, with *scienter*, that these securities were free trading when, in reality, he knew or was reckless in not knowing, that they were restricted shares, there was no registration statement in effect, and no exemption applied.  He also failed to disclose his role in preparing false transfer agent records, including his role in procuring a false, backdated opinion letter that he provided and falsely testified about in a Commission investigation.

### G.     LUND AND STANDARD TRANSFER & TRUST WHOLLY IGNORE AND FAIL TO COMPLY WITH MULTIPLE TRANSFER AGENT REGULATIONS.

58.     Standard Transfer & Trust is a registered transfer agent.  Lund is the president of Standard Transfer & Trust.  He controls Standard Transfer & Trust and is the person responsible for designing, implementing and controlling its policies and procedures and for making necessary filings with the Commission.  During the time period relevant to this Complaint, Standard Transfer & Trust acted as the transfer agent for Mosaic Nutraceuticals Corp.

59.     Standard Transfer & Trust improperly removed restricted legends from at least 15 million shares of Mosaic stock and improperly recorded those shares in its books and records as free trading.  As a result of this intentional conduct, Standard Transfer & Trust did not maintain an accurate control book related to Mosaic.  Lund, with scienter, directly caused these failures.

60.     Standard Transfer & Trust failed to prevent Lund from removing restricted legends from securities for which Standard Transfer & Trust performed stock transfer functions. Lund removed restrictive legends without direction from the issuer and without a legal opinion to justify the removal.  Standard Transfer & Trust failed to maintain any procedure or policy that would reasonably prevent such actions.

61.     Standard Transfer & Trust last filed a Form TA-2 with the Commission on April 5, 2005, for the year 2004.  It has not filed its Form TA-2 for 2005, 2006, 2007 and 2008.

62.     Standard Transfer & Trust keeps and processes records both at its office in Las Vegas, Nevada and at Lund's residence in Salt Lake City, Utah.  Standard Transfer & Trust's original Form TA-1 lists only the Las Vegas, Nevada office as a location where it keeps and processes its records.  It has not amended its original Form TA-1 to list Lund's residence in Salt Lake City, Utah as an additional location where it kept and processed records.  Lund failed to amend its original Form TA-1 to List Lund's residence in Salt Lake City, Utah as an additional location where Standard Transfer & Trust kept and processed its records.

63.     During 2006 and 2007, Standard Transfer & Trust failed to turn around 90% of all routine items received within three business days of receipt for at least six months during 2006 and 2007.  It did not notify the Commission of these failures.  Specifically, Standard Transfer & Trust failed to timely file with the Commission a written notice that states, among other things, the number of routine items received during the month, the number of routine items the transfer agent failed to turn around, the reasons for such failure, and the steps that have been taken or will be taken to prevent a future failure.  Lund was responsible for ensuring that Standard Transfer &

Trust properly turned around routine matters and he failed to do so.  He was also responsible for filing the necessary notice with the Commission and failed to do so.

64.     Lund regularly has many transfer agent-related items forwarded to him in Salt Lake City from Standard Transfer & Trust's office in Las Vegas.  Standard Transfer & Trust did not have any procedures in place designed to forward such items to Lund's residence in a manner allowing a timely turn around and in fact failed to forward such items in a manner allowing a timely turn around.  Lund was responsible for ensuring that Standard Transfer & Trust properly forwarded the materials and he failed to do so.

65.     During a two-month period in 2006 and another two-month period in 2007, Standard Transfer & Trust failed to turn around 75% of routine items and did not, within twenty days after the close of the second month of each two-month period, send a notice to the CEO of each issuer for which it acted as a transfer agent regarding this failure or file any such notice.

66.     After having failed to turn around 90% of routine items for three consecutive months, Standard Transfer & Trust accepted new business.

67.     Stanford Transfer & Trust failed to create and retain records regarding all transactions for the issuers for which it acted as transfer agent.  These failures included failing to correct the "received" dates for items received; failing to log items; failing to compute turn around statistics and turn around percentages; failing to maintain transfer documentation; failing to maintain a correspondence log; erroneously categorizing "routine" items as "non-routine;" failing to obtain an affidavit for a lost replacement certificate; and transferring an item without the original stock certificate.

68.     Stanford Transfer & Trust failed to maintain control books for all its issuers, i.e., a record or document that properly shows the total number of shares (in the case of equity securities) or the principal dollar amount (in the case of debt securities) authorized and issued by the issuer.  In a control book, the shares issued should correspond to the total number of shares outstanding as reflected in the master security holder files.

69.     During a consecutive six-month period in 2006, Standard Transfer & Trust received more than 500 items.  Despite receiving more than 500 items during this consecutive six-month period, Standard Transfer & Trust did not file a report prepared by an independent accountant concerning Standard Transfer & Trust's system of internal accounting control and related procedures for the transfer of ownership and the safeguarding of related securities and funds.

70.     Standard Transfer & Trust failed to conduct any searches for lost security holders.

71.     Prior to December 2007, Standard Transfer & Trust failed to stamp "cancelled" on at least 22 stock certificates and failed to properly cancel or void original blank certificates for at least two issuers.

72.     Standard Transfer & Trust represented in its transfer agency procedures that it was a member of the Securities Information Center.  In fact, it was not a member of the Securities Information Center and therefore could not have reported, as it is required to do, the discovery of the theft or loss of securities when there was a substantial basis for believing that criminal activity was involved.

73.      With regard to each failure and action by Standard Transfer & Trust alleged above in paragraphs 58 through 73, Lund was Standard Transfer & Trusts president and its

principal and sole employee.   Lund, acting with scienter because he knew or was reckless in not

knowing of these failures and actions, provided substantial assistance to each violation.  In fact,

without his conduct or inaction, Standard Transfer & Trust could not, and therefore, would not,

have violated the federal securities laws.

**FIRST CLAIM**
**Securities Fraud:  Lund's Violations of Section 10(b) of the Exchange Act and**
**Rule 10b-5 Thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]**

74.     Plaintiff Commission hereby incorporates paragraphs 1 through 73 as if fully set

forth herein.

75.     Defendant Lund, directly or indirectly, singly or in concert with others, in

connection with the purchase and sale of securities, by use of the means and instrumentalities of

interstate commerce and by use of the mails, and in violation of has:  (a) employed devices,

schemes and artifices to defraud; (b) made untrue statements of material facts and omitted to

state material facts necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading; and (c) engaged in acts, practices and courses of

business which operate as a fraud and deceit upon purchasers, prospective purchasers, sellers and

other persons.

76.     Defendant Lund acted with scienter, i.e., he knowingly or recklessly engaged in

the conduct described in this claim.

77.     By reason of the foregoing, Defendant Lund violated, and unless enjoined, will

continue to violate the provisions of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and

Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM
### Securities Fraud:  Lund's Violations of Section 17(a)
### of the Securities Act [15 U.S.C. § 77q(a)]

78.     Plaintiff Commission repeats and realleges paragraphs 1 through 73 above.

79.     Lund, directly or indirectly, singly or in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce and by use of the mails, has (i) employed devices, schemes or artifices to defraud; (ii) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit.

80.      As part of and in furtherance of this scheme, Lund, directly and indirectly, prepared, disseminated or used contracts, written offering documents, promotional materials, investor and other correspondence, and oral presentations, which contained untrue statements of material fact and which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

81.     Lund made the referenced misrepresentations and omissions and acted in furtherance of his fraud with *scienter, i.e.*, knowingly or recklessly disregarding the truth.

82.     For these reasons, Lund has violated, and unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## THIRD CLAIM
### Sale of Unregistered Securities:  Lund's Violations of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a) and 77e(c)]

83.     Plaintiff Commission hereby incorporates paragraphs 1 through 73 as if fully set forth herein.

84.     Defendant Lund, directly or indirectly, singly or in concert with others:  (a) without a registration statement in effect as to the securities, (i) made use of the means or instruments of transportation or communication or the mails to sell such securities through the use or medium of a prospectus or otherwise, or (ii) carried or caused to be carried through the mails, or in interstate commerce, by any means or instruments of transportation, such securities for the purpose of sale or for delivery after sale; and (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of a prospectus or otherwise securities for which a registration statement had not been filed as to such securities.

85.     By reason of the foregoing, Defendant Lund violated and, unless enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## FOURTH CLAIM
### Transfer Agent Violations:  Standard Transfer & Trust's Failure to Comply with Section 17A(c)(2) of the Exchange Act  [15 U.S.C. 78q-1(c)(2)] and Rules 17Ac2-1 and 17Ac-2-2 thereunder [17 C.F.R. 240.17Ac2-1 and 17Ac2-2]

86.     The allegations in paragraphs 1 through 73 are realleged and incorporated by reference as if fully set forth herein.

87.     Section 17A(c)(2) of the Exchange Act and Rule 17Ac2-1 thereunder require that a transfer agent seeking registration with the Commission complete and file an accurate Form

TA-1.  Among other things, Form TA-1 requires the registrant to disclose and identify all locations where transfer agent records are processed and kept.  Rule 17Ac2-1(c) requires the transfer agent to update its Form TA-1 within 60 days following the date on which the information becomes inaccurate, misleading or incomplete.   Rule 17Ac2-2 requires registered transfer agents to file annual reports on Form TA-2 within 90 days of the calendar year end.

88.     By reason of the foregoing, Standard Transfer & Trust violated, and unless restrained and enjoined, will continue to violate, Section 17A(c)(2) of the Exchange Act and Rules 17Ac2-1 and 17Ac2-2 thereunder.

## FIFTH CLAIM
## Transfer Agent Violations:  Standard Transfer & Trust's Failure to Comply with Rule 17Ad-2 of the Exchange Act  [17 C.F.R. 240.17Ad-2]

89.     The allegations in paragraphs 1 through 73 are realleged and incorporated by reference as if fully set forth herein.

90.     Exchange Act Rule 17Ad-2 requires all transfer agents turn around within three business days of receipt at least 90 percent of all routine items received and Exchange Act Rule 17Ad-2(c) requires a transfer agent that violates Rule 17Ad-2(a) to, within 10 business days following the end of the month, file with the Commission a written notice that states, among other things, the number of routine items received during the month, the number of routine items the transfer agent failed to turn around, the reasons for such failure, and the steps that have been taken or will be taken to prevent a future failure.  Rule 17Ad(2)(f) requires a transfer agent that receives items at a location other than the premises at which it performs transfer agent functions to have in place appropriate procedures to assure, and shall assure, that items are forwarded to such premises promptly.

91.     By reason of the foregoing, Standard Transfer & Trust violated, and unless restrained and enjoined, will continue to violate, Rule 17Ad-2 of the Exchange Act.

## SIXTH CLAIM
### Transfer Agent Violations:  Standard Transfer & Trust's Failure to Comply with Rule 17Ad-3 of the Exchange Act  [17 C.F.R. 240.17Ad-3]

92.     The allegations in paragraphs 1 through 73 are realleged and incorporated by reference as if fully set forth herein.

93.     Rule 17Ad-3(b) of the Exchange Act requires a transfer agent that fails for two consecutive months to turn around 75% of all routine items must, within twenty business days after the close of the second month, send to the CEO of each issuer for which the transfer agent acts a copy of a written notice filed pursuant to Rule 17Ad-2(c).  Rule 17Ad-3(a) prohibits a transfer agent that is for three consecutive months required to file a notice pursuant to Rule 17Ad-2(c) from accepting new business for three months following the end of the three-month notice period.

94.     By reason of the foregoing, Standard Transfer & Trust violated, and unless restrained and enjoined, will continue to violate, Rule 17Ad-3 of the Exchange Act.

## SEVENTH CLAIM
### Transfer Agent Violations:  Standard Transfer & Trust's Failure to Comply with Rules 17Ad-6 and 17Ad-10 of the Exchange Act  [17 C.F.R. 240.17Ad-6 and 10]

95.     The allegations in paragraphs 1 through 73 are realleged and incorporated by reference as if fully set forth herein.

96.     Rule 17Ad-6 requires every registered transfer agent to make and keep current a daily log listing what items are received, processed, and sent out during the day, listing debit and credit details, account holders, and numbers of the new and cancelled shares authorized and

issued by the issuer and to make and keep current transfer agent appointment information.  Rule 17Ad-10(e) requires transfer agents to maintain and keep current an accurate control book (as defined in Rule 17Ad-9(d)) for each issue of securities.

97.     By reason of the foregoing, Standard Transfer & Trust violated, and unless restrained and enjoined, will continue to violate, Rule 17Ad-6 and Rule 17Ad-10 of the Exchange Act.

**EIGHTH CLAIM**
**Transfer Agent Violations:  Standard Transfer & Trust's Failure to Comply with Rule 17Ad-13 of the Exchange Act [17 C.F.R. 240.17Ad-13]**

98.     The allegations of paragraphs 1 through 73 are realleged and incorporated by reference as if fully set forth herein.

99.     Rule 17Ad-13 of the Exchange Act requires every transfer agent that received more than 500 items in a consecutive six-month period to file annually with the Commission a report prepared by an independent accountant concerning the transfer agent's system of internal accounting control and related procedures for transfer of ownership and the safeguarding of related securities and funds.  The accountant's report must be filed within 90 calendar days of the date of the study and evaluation.

100.    By reason of the foregoing, Standard Transfer & Trust violated, and unless restrained and enjoined, will continue to violate, Rule 17Ad-13 of the Exchange Act.

**NINTH CLAIM**
**Transfer Agent Violations:  Standard Transfer & Trust's Failure to Comply with Rule**
**17Ad-17 and Rule 17Ad-19 of the Exchange Act**
**[17 C.F.R. 240.17Ad-17 and 19]**

101.    The allegations of paragraphs 1 through 73 are realleged and incorporated by reference as if fully set forth herein.

102.    Rule 17Ad-17(a) requires transfer agents to conduct periodic searches for lost security holders with specified frequency at no charge to the security holder.  Rule 17Ad-19 requires transfer agents to establish and implement procedures for, among other things, the cancellation of securities certificates.

103.    By reason of the foregoing, Standard Transfer & Trust violated, and unless restrained and enjoined, will continue to violate, Rules 17Ad-17 and 17Ad-19 of the Exchange Act.

**TENTH CLAIM**
**Transfer Agent Violations:  Standard Transfer & Trust's Failure to Comply with Rule 17f-**
**1 of the Exchange Act**
**[17 C.F.R. 240.17f-1]**

104.    The allegations of paragraphs 1 through 73 are realleged and incorporated by reference as if fully set forth herein.

105.    Rule 17f-1 requires that a registered transfer agent register with the Securities Information Center and report to the Securities Information Center the discovery of the theft or loss of securities when there is a substantial basis for believing that criminal activity was involved.

106.    By reason of the foregoing, Standard Transfer & Trust violated, and unless restrained and enjoined, will continue to violate, Rule 17f-1 of the Exchange Act.

**ELEVENTH CLAIM**

<u>**Transfer Agent Violations:  Standard Transfer & Trust's Failure to Comply with Rule 17Ad-12 of the Exchange Act  [17 C.F.R. 240.17Ad-12]**</u>

107.    The allegations of paragraphs 1 through 73 are realleged and incorporated by reference as if fully set forth herein.

108.    Rule 17Ad-12 requires registered transfer agents to maintain reasonable safeguards for funds and securities for each issue of securities for which they perform stock transfer functions.

109.    By reason of the foregoing, Standard Transfer & Trust violated, and unless restrained and enjoined, will continue to violate, Rule 17Ad-12 of the Exchange Act.

**TWELFTH CLAIM**

<u>**Transfer Agent Violations:  Standard Transfer & Trust's Failure to Comply with Section 17(a)(3) of the Exchange Act  [15 U.S.C. 78q(a)(3)]**</u>

110.    The allegations of paragraphs 1 through 73 are realleged and incorporated by reference as if fully set forth herein.

111.    Section 17(a)(3) of the Exchange Act [15 U.S.C. 78q(a)(3)] requires registered transfer agents to make and keep any records required by Section 17A of the Exchange Act and the Rules thereunder.

112.    By virtue of the conduct described herein, Standard Transfer has violated, and unless restrained and enjoined, will continue to violate Section 17(a)(3) of the Exchange Act.

**THIRTEENTH CLAIM**

<u>**Transfer Agent Violations:  Standard Transfer & Trust's Failure to Comply with Section 17A(d)(1) of the Exchange Act  [15 U.S.C. 78q-1(d)(1)]**</u>

113.    The allegations of paragraphs 1 through 73 are realleged and incorporated by reference as if fully set forth herein.

114.    Section 17A(d)(1) of the Exchange Act prohibits transfer agents from, directly or indirectly, engaging in any activity as a transfer agent in contravention of the rules promulgated by the Commissions.

115.    By virtue of the conduct described herein, Standard Transfer has violated, and unless restrained and enjoined, will continue to violate Section 17A(d)(1) of the Exchange Act.

**FOURTEENTH CLAIM**
**Transfer Agent Violations:  Lund's Aiding and Abetting of**
**Standard Transfer & Trusts Violations**

116.    The allegations in paragraphs 1 through 73 are realleged and incorporated by reference as if fully set forth herein.

117.    As described above, Standard Transfer & Trust violated Sections 17(a)(3), 17A(c)(2) and 17A(d)(1) of the Exchange Act and Exchange Act Rules 17Ac2-1, 17Ac2-2, 17Ad-2, 17Ad-3, 17Ad-6, 17Ad-10, 17Ad-12, 17Ad-13, 17Ad-17, 17Ad-19 and 17f-1.  Lund knowingly or recklessly provided substantial assistance to Standard Transfer in connection with these violations.

118.    By reason of the foregoing, Defendant Lund aided and abetted, and unless restrained and enjoined will continue to aid and abet, violations of  Sections 17(a)(3), 17A(c)(2) and 17A(d)(1) of the Exchange Act and Exchange Act Rules 17Ac2-1, 17Ac2-2, 17Ad-2, 17Ad-3, 17Ad-6, 17Ad-10, 17Ad-12, 17Ad-13, 17Ad-17, 17Ad-19 and 17f-1.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

(1)    Permanently enjoining Defendant Lund, and his agents, servants, employees, attorneys, and those in active concert or participation with it, who receive actual notice by

personal service or otherwise, from violating Sections 5(a), 5(c) and 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder and from aiding and abetting violations of Sections 17(a)(3), 17A(c)(2) and 17A(d)(1) of the Exchange Act and Rules 17Ac2-1, 17Ac2-2, 17Ad-2, 17Ad-3, 17Ad-6, 17Ad-10, 17Ad-12, 17Ad-13, 17Ad-17, 17Ad-19 and 17f-1 thereunder;

(2)     Permanently enjoining Defendant Standard Transfer & Trust  and its  agents, servants, employees, attorneys, and those in active concert or participation with them, who receive actual notice by personal service or otherwise,  from violating Sections 17(a)(3), 17A(c)(2) and 17A(d)(1) of the Exchange Act and Rules 17Ac2-1, 17Ac2-2, 17Ad-2, 17Ad-3, 17Ad-6, 17Ad-10, 17Ad-12, 17Ad-13, 17Ad-17, 17Ad-19 and 17f-1 thereunder;

(3)     Ordering Defendant Lund to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Defendants Lund and Standard Transfer & Trust to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

(5)     Order Defendant Lund to disgorge an amount equal to the funds and benefits he obtained illegally as a result of the violations alleged herein, plus prejudgment interest on that amount;

(6)     Permanently barring Defendant Lund from participating in an offering of penny stock pursuant to Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)]; and

(7)     Order any additional relief that this Court may deem just and proper.

DATED:  November 30, 2009

Respectfully submitted,

/s/ Thomas M. Melton
_____
Thomas M. Melton, Esq., Bar No. 4999
Securities and Exchange Commission
15 W. South Temple Street
Suite 1800
Salt Lake City, UT 84101
(801) 524-6748

David B. Reece
Texas Bar No. 24002810
Securities and Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, Texas  76102-6882
(817) 978-6476
(817) 978-4927 (fax)
reeced@sec.gov
ATTORNEY FOR PLAINTIFF